**In re AIR NAIL COMPANY, INC.,
a Pennsylvania corporation,
et al., Debtors.**

**Alameda Produce Market,
Inc., Plaintiff,**

**v.**

**Air Nail Co., Inc. and Bruce Massman
and Martin Massman,
Defendants.**

**Bankruptcy No. 03–29029–MBM.
Adversary No. 03–3203–MBM.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Aug. 8, 2005.

Paula Schmeck, Lauren Rushak, and Michael Abramson, for Alameda Produce Market, Inc.

Neil Siegel, John Byrne, and Michael Koomer, for Bruce and Martin Massman.

John Steiner, for Air Nail Co., Inc.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH,
Bankruptcy Judge.

Alameda Produce Market, Inc. (hereafter "Alameda") brings the instant multi-count action against Bruce and Martin Massman (hereafter "the Massmans") and Air Nail Company, Inc., the instant debtor-in-possession (hereafter "the Debtor"), so as to exact from such defendants substantial relief relative to Alameda's attempted purchase from the Massmans of commercial realty that is presently occupied by, as well as leased by the Massmans to, the Debtor. In particular, Alameda (a)

brings a breach of contract action against the Massmans for their alleged breach of an amended contract to sell such realty to Alameda (Counts 1, 2, 4, 6, and 7), (b) seeks declaratory relief against the Massmans relative to such contract to sell (Counts 3 and 5), and (c) sues the Massmans as well for fraud relative to such sale (Count 8). With respect to the Debtor, Alameda seeks declaratory relief to the effect that the aforesaid lease between the Massmans and the Debtor is null and void (Counts 9 and 10). Alameda pursues against the Debtor as well claims for intentional interference with contractual relations (Counts 11 and 13), and interference with prospective economic advantage (Counts 12 and 14); each such claim pertains to alleged actions that were taken by the Debtor with respect to the realty that is the subject of Alameda's claims against the Massmans.

The Massmans counterclaim against Alameda for breach of the amended contract between themselves regarding the aforesaid sale of realty to Alameda (Counterclaims 1, 2, and 4). The Massmans also seek declaratory relief as against Alameda to the effect that such contract has terminated, and that Alameda thus no longer has any sort of interest in the realty that is the subject of such contract (Counterclaim 3). Finally, the Debtor crossclaims against the Massmans for indemnity in the event that it is found liable to Alameda.

The Court observes that Alameda divides its aforesaid breach of contract cause of action into five separate counts, namely Counts 1, 2, 4, 6, and 7. Notwithstanding such organization, the Court finds that each such count is essentially but part of the same breach of contract cause of action, albeit with different prayers for relief. The Court likewise observes that the Massmans divide their counterclaim for contract breach into three separate claims,

namely their first, second, and fourth claims. Notwithstanding such organization, the Court finds that each such claim is essentially but part of one counterclaim for contract breach, albeit with different requests for relief.

Presently before the Court is the Massmans' motion for summary judgment on all of Alameda's counts against the Massmans, as well as on all of the Massmans' counterclaims against Alameda. For the reasons set forth below, the Court shall grant the Massmans' summary judgment motion in its entirety.

### STATEMENT OF FACTS [1]

On August 26, 2002, Alameda and the Massmans entered into a contract to buy and sell, respectively, commercial real property located at and commonly known as 8685 Bowers Avenue, South Gate, California (hereafter "the Realty"). The terms of such contract to buy and sell are those set forth in an August 2, 2002 document drafted by a predecessor in interest to Alameda and entitled "Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate," except to the extent (a) modified by an August 23, 2002 document drafted by the Massmans and entitled "Counter Offer—Seller," and (b) perhaps modified by additional letters dated in October 2002 (hereafter collectively referred to as "the Purchase Agreement"). Pursuant to the Purchase Agreement and the parties' escrow instructions, Alameda paid a deposit of $100,000 for the Realty (hereafter "the $100,000 Deposit") to Commerce Escrow Company, the escrow holder (hereafter "the Escrow Holder"), which deposit remains in escrow at this time. On or about December 27, 2002, the Massmans declared that the Purchase Agreement was terminated, apparently on the ground that Alameda had failed within six-

ty days of the opening of escrow to enter into an initial lease of the Realty as called for by the Purchase Agreement. Alameda disputed then, and continues to dispute, that the Purchase Agreement was effectively terminated as of December 27, 2002. However, the Massmans refused to perform further under the Purchase Agreement subsequent to December 27, 2002.

On January 15, 2003, the Massmans entered into a Standard Industrial/Commercial Single–Tenant Lease (Net) with the Debtor pursuant to which the Massmans leased the Realty to the Debtor for a period of ten years and three months (hereafter "the Air Nail Lease"). The Debtor presently occupies, and has at all times since January 2003 occupied, the Realty pursuant to the Air Nail Lease. Attached as an addendum to the Air Nail Lease is a Right of First Refusal to Purchase, wherein the Massmans granted to the Debtor the right to match any sale offer regarding the Realty during the term of the Air Nail Lease (hereafter "the Right of First Refusal"); the Right of First Refusal was to be exercisable by the Debtors only within a twenty day period that would commence upon the provision of notice by the Massmans as to the terms of the offer of a sale regarding the Realty.

On or about February 11, 2003, and in reaction to the Massmans' refusal to perform further under the Purchase Agreement subsequent to December 27, 2002, and the Debtor's entry into the Air Nail Lease and consequent occupation of the Realty, Alameda initiated litigation in a California state court against the Massmans and the Debtor, *Alameda Produce Market, Inc. v. Martin Massman and Bruce Massman, et al.* (Los Angeles County Superior Court, Case No. BC 290142) (hereafter "the California Action").

---

**1.** The following facts are undisputed between the parties unless otherwise noted herein.

The California Action was subsequently stayed as to the Debtor by virtue of the Debtor's commencement of the instant Chapter 11 bankruptcy case on July 18, 2003. Thereafter, in November 2003, Alameda initiated the instant adversary proceeding by filing its original complaint, which complaint (a) named only the Debtor as a party defendant, and (b) sought, *inter alia*, declaratory relief to the effect that the Air Nail Lease was invalid.

On March 1, 2004, the Massmans and Alameda settled the California Action by entering into a Settlement Agreement and Mutual Release (hereafter "the Settlement Agreement"); the parties entered into such settlement notwithstanding that the California Action had been dismissed without prejudice at a hearing that took place on February 26, 2004. Pursuant to ¶ 4 of the Settlement Agreement, Alameda then waived any right that it had to refile the California Action against the Massmans, and agreed to treat the prior dismissal of such suit as one with prejudice as to the Massmans.

Pursuant to ¶ 1 of the Settlement Agreement, the Massmans and Alameda also agreed that:

> [s]ubject to whatever rights Air Nail [ (i.e., the Debtor) ] has under the Right of First Refusal, the Massmans shall sell the Property [ (i.e., the Realty) ] to Alameda for a cash purchase price of $6.5 million ("Purchase Price"), in accordance with the terms and conditions of the Purchase Agreement (which shall be deemed in full force and effect), as modified by that certain Amendment No. 3 to Purchase Agreement being executed concurrently herewith.

The Amendment No. 3 to Purchase Agreement referred to in ¶ 1 of the Settlement Agreement (formally entitled "Amendment No. 3 to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate" and hereafter referred to as "Amendment No. 3") contains the following provisions pertinent to a resolution of the instant matter:

> AM3–1. *CLOSING DATE.* Paragraph 8.8 of the Purchase Agreement shall be deleted in its entirety and replaced with the following:

> "The Closing shall take place ... no later than May 26, 2004 .... Notwithstanding any provisions of the Purchase Agreement or of any general provisions or procedures otherwise governing the Escrow to the contrary, if ... (ii) through no fault of Seller [(i.e., the Massmans)], the Closing does not occur on or before May 26, 2004, time being of the essence, this [(i.e., the Purchase)] Agreement shall automatically terminate and the Escrow shall be cancelled for all purposes, ... without the requirement of any further notice or instructions. Immediately following ... such event, Escrow Holder shall pay the $100,000 Deposit (together with any interest earned thereon) to Seller as liquidated damages in accordance with Paragraph 21 of the Purchase Agreement, Buyer [(i.e., Alameda)] shall return to Seller all building plans for the Property [(i.e., the Realty)] previously delivered to Buyer and the Parties shall have no further rights or obligations under the Purchase Agreement."

> AM3–3. *NO REPRESENTATIONS OR WARRANTIES.* All representations and warranties of Seller contained in the Purchase Agreement, in the Property Information Sheet or in any other documents delivered to Buyer under the Purchase Agreement are hereby deleted and shall be of no force and effect. Without in any way limiting the foregoing, Paragraph 12 of the Purchase Agreement shall be deleted in its entirety and replaced with the following:

"Buyer acknowledges and agrees that no representations or warranties, express or implied, have been made to Buyer by Seller or by Seller's agents, employees or attorneys, including with respect to the environmental condition of the Property .... Buyer acknowledges and agrees that upon the Close of Escrow, except as provided herein, Seller shall sell and convey to Buyer and Buyer shall accept the Property 'AS IS, WHERE IS, WITH ALL FAULTS'. Buyer has not relied and will not rely on, and Seller has not made and is not liable for or bound by, any implied warranties, guarantees, statements, representations or information pertaining to the Property or relating thereto (including specifically, without limitation, information or packages distributed with respect to the Property, or reports or information provided by Seller to Buyer or its agent) made or furnished by Seller, or any real estate broker, agent or third party representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing."

AM3–4. *TITLE MATTERS.* The Title Commitment previously delivered by the Escrow Holder to, and approved by, Buyer dated September 9, 2002, ... shall be updated as soon as possible after the Effective Date [ (i.e., March 1, 2004) ]. Buyer's obligation to close escrow shall be conditioned upon the updated Title Commitment showing only the following additional title exceptions:

(i) the Air Nail Lease and the Air Nail Bankruptcy, ... (v[ ]) the pending Action [(i.e., the California Action)], or any other title exceptions arising by reason of the acts or omissions of Buyer, ... and (vii) any other exceptions approved in writing by Buyer or otherwise created by Buyer's acts or omissions.

AM3–5. *WAIVER OF CONTINGEN-CIES.* Subject to the provisions of Section AM3–7 below [(pertaining to Environmental Matters)], Buyer acknowledges and agrees ... that all of the contingencies to the Closing set forth in Paragraph 9 of the Purchase Agreement have been satisfied or waived, and therefore are deemed approved.

AM3–9. *AIR NAIL LEASE MAT-TERS.*

(a) The Air Nail Lease ..., to the extent then still in existence, shall be assigned to Buyer (which in any case disputes the validity of the Air Nail Lease) at the Closing as [an] Existing Lease[ ] in accordance with Paragraph 10.2(c) of the Purchase Agreement, but without the requirement of any Estoppel Certificates.

AM3–11. *LIQUIDATED DAMAGES.* THE $100,000 DEPOSIT UNDER THE PURCHASE AGREEMENT CONSTITUTES THE LIQUIDATED DAMAGES AMOUNT IN ACCORDANCE WITH THE PROVISIONS OF PARAGRAPH 21 OF THE PURCHASE AGREEMENT ....

AM3–12. *EFFECT OF AMEND-MENT.* If there is any conflict between the provisions of this Amendment and the provisions of the Purchase Agreement, the provisions of this Amendment shall control. This Amendment shall be deemed incorporated into the Agreement as though fully set forth therein. Except as amended by the terms of this Amendment, all of the terms and conditions of the Purchase Agreement, and each and every Exhibit thereto, are hereby reinstated in their entirety and shall continue in full force and effect.

The following provisions of the Purchase Agreement are relevant to a resolution of the instant matter:

9. Contingencies to Closing.

9.1 The closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies. IF BUYER FAILS TO NOTIFY ESCROW HOLDER, IN WRITING, OF THE DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS APPROVED SUCH ITEM, MATTER OR DOCUMENT. Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives.

(f) Conditions of Title. Escrow Holder shall cause a current commitment for title insurance ("Title Commitment") concerning the Property issued by the Title Company ... to be delivered to Buyer within 90 days following the Date of Agreement. Buyer has 10 days from the receipt of the Title Commitment ... to satisfy itself with regard to the condition of title. The disapproval of Buyer *of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.*

9.2 All of the contingencies specified in subparagraphs (a) through (p) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be

elsewhere herein referred to as "Buyer Contingencies."

9.3 If any Buyer's Contingency or any other matter subject to Buyer's approval is disapproved as provided for herein in a timely manner ("Disapproved Item"), Seller shall have the right within 10 days following the receipt of notice of Buyer's disapproval to elect to cure such Disapproved Item prior to the Expected Closing Date ("Seller's Election"). Seller's failure to give to Buyer within said 10 day period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the election, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this transaction. Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this transaction. Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency.

16. Attorneys' Fees.

If any Party or Broker brings an action or proceeding ... involving the Property, to enforce the terms hereof, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.... The term "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case

may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

21. LIQUIDATED DAMAGES....

THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF $100,000.

Finally, the following provisions of the Settlement Agreement are pertinent to a resolution of the instant matter:

5. *Provisions Relating to Air Nail Bankruptcy and Air Nail Lease.*

(b) From the Effective Date through the Closing ... (i) the Massmans shall cooperate promptly and fully with Alameda in connection with any proposed and existing legal action to be taken by Alameda with respect to the Air Nail Lease, including but not limited to providing declarations approved by counsel for the Massmans, provided that such cooperation is at no additional liability or cost to the Massmans ...; and (iii) to the extent there is a reasonable basis to do so under the terms of the Air Nail Lease and under applicable Bankruptcy and state laws, the Massmans

shall not affirmatively ... (B) agree to waive any term or provision of the Air Nail Lease, (C) agree to accept less than complete and timely and prompt performance of all conditions, terms and covenants of the Air Nail Lease and payment of all rents and other monies due under the Air Nail Lease (and, in that connection, it is acknowledged that Air Nail is currently delinquent in the payment of rent, late charges, taxes and insurance and has not timely satisfied third party claims resulting in mechanic's liens against the Property), or (D) take any material action regarding the Air Nail Lease, in each such case without first obtaining the prior written consent of Alameda, which consent shall not be unreasonably withheld, conditioned or delayed.

8. *Further Assurances.* Each Party will at any time, and from time to time, upon reasonable request take or cause to be taken any action, execute, acknowledge, deliver or record any further documents or instruments in order to carry out the purposes of this Agreement.

10. *Attorney's Fees.* Should a suit ... be brought to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees to be fixed in amount by the Court ....

14. *Entire Agreement.* This Agreement, together with the Purchase Agreement (as amended by the Amendment [(i.e., Amendment No. 3)]) and the Stipulation, contains the entire agreement between the Parties with respect to the transactions contemplated hereby ....

15. *Amendments.* No amendment, modification, termination or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the

Parties and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

The Settlement Agreement, at ¶¶ 2—3, also contains comprehensive releases by and between Alameda and the Massmans, not only with respect to things known to each party but also with respect to unknown things and things that might occur in the future, excepting for obligations and covenants arising from the Settlement Agreement, the Purchase Agreement, or Amendment No. 3. Finally, Alameda and the Massmans, pursuant to ¶ 6 of the Settlement Agreement, agreed upon a streamlined method for enforcement of the Settlement Agreement, the Purchase Agreement, and/or Amendment No. 3 pursuant to the provisions of California Code of Civil Procedure § 664.6, whereby the nondefaulting party could initiate a new lawsuit, file a Stipulation for Entry of Judgment Pursuant to Terms of Stipulated Settlement (hereafter "the Stipulation"), and request that judgment then be entered in accordance with the Stipulation within 24 hours. Said ¶ 6 (and the Stipulation as well) provides that, if the nondefaulting party utilizes the aforesaid streamlined method for enforcement of any of the three documents in question, then, before such utilization,

> the non-defaulting Party shall give notice to the defaulting Party of its intent to exercise such right and the basis upon which a default is being claimed and thereafter the defaulting Party shall have the right to cure the default under this Agreement or under the Purchase Agreement, or both, as the case may be, within ten (10) days after receiving such notice.

On or about March 5, 2004, the Massmans issued a notice of sale to the Debtor (apparently describing the terms of sale to Alameda pursuant to the Purchase Agreement and Amendment No. 3) so as to activate the Right of First Refusal, which Right of First Refusal the Debtor failed to take advantage of within the requisite 20–day period that was contractually accorded to it. On or about April 5, 2004, the Debtor filed with, and had recorded by, the Los Angeles County Recorder's Office a *lis pendens* (i.e., Notice of Pendency of Action) upon the Realty; the action described in such *lis pendens* is the instant adversary proceeding pending in this Court (hereafter "the *Lis Pendens*"). The *Lis Pendens* remains as a cloud on title to the Realty (hereafter "the Title") as of the present time.

Alameda maintains that the *Lis Pendens* is not a permitted title exception under Amendment No. 3 ¶ AM3–4. Furthermore, Alameda, by letter dated May 20, 2004, to the Escrow Holder, noted its disapproval of the *Lis Pendens*. Moreover, Alameda maintains that (a) the Massmans were contractually obligated to have the *Lis Pendens* removed from the Title prior to the date upon which sale of the Realty to Alameda was to close, and (b) the Massmans breached the Purchase Agreement, Amendment No. 3, and the Settlement Agreement by failing to clear the *Lis Pendens* from such title. The Massmans, on the other hand, contend that the *Lis Pendens* is a permitted title exception under Amendment No. 3 ¶ AM3–4. The Massmans also maintain that, even if the *Lis Pendens* is not such a permitted title exception, they nevertheless, after execution of Amendment No. 3 and the Settlement Agreement on March 1, 2004, no longer had any obligation to clear the Title of such defect.

Alameda never undertook itself to expunge the *Lis Pendens* in this Court prior to May 26, 2004, which date is when a closing was to occur pursuant to Amend-

ment No. 3. Instead, Alameda maintains that it wished to obtain relief from the automatic stay in the instant bankruptcy case sufficiently prior to such date so that it could have then moved, on an *ex parte* basis, in California Superior Court to expunge the *Lis Pendens*. However, Alameda failed to seek such stay relief itself until after May 26, 2004. Alameda refrained from seeking such stay relief, it says, because it had enlisted the aid of the Massmans in obtaining such stay relief. In particular, according to Alameda, the Massmans had agreed to obtain such stay relief on Alameda's behalf via a motion that the Massmans had brought so as to obtain stay relief for themselves due to, *inter alia*, the Debtor's failure to stay current on rent due under the Air Nail Lease. The Massmans ultimately settled the aforesaid stay relief motion. The terms of such settlement did not include any provision for stay relief regarding expungement of the *Lis Pendens*. The Massmans orally conveyed the terms of such settlement to the Court at a hearing regarding the aforesaid stay relief motion on May 18, 2004; counsel for Alameda was present at such hearing. The Massmans presently take the position that, contrary to what Alameda contends, the Massmans never agreed to obtain any sort of stay relief on behalf of Alameda vis-a-vis expungement of the *Lis Pendens*.

Alameda failed to close on the purchase/sale of the Realty on May 26, 2004. Alameda maintains that (a) it failed to so close because of the continued existence of the *Lis Pendens* as a cloud on the Title as of May 26, 2004, (b) its timely performance under Amendment No. 3, that is its obligation to close by May 26, 2004, is excused by the Massmans' failure to have the *Lis Pendens* removed from the Title by such date, (c) it is thus the Massmans' fault that such closing did not occur by May 26, 2004, (d) the Purchase Agreement, as modified

by, and pursuant to ¶ AM3–1 of, Amendment No. 3, has thus not yet terminated and, therefore, remains viable, and (e) the Massmans thus have breached, and continue to breach, the Purchase Agreement, Amendment No. 3, and the Settlement Agreement by virtue of their refusal after May 26, 2004, to perform further under said contractual documents. The Massmans, on the other hand, presently take the position—which position they appear to have consistently taken since a closing failed to occur on May 26, 2004—that, because such closing did not occur by May 26, 2004, (a) the Purchase Agreement, pursuant to Amendment No. 3 ¶ AM3–1, automatically terminated, thereby leaving Alameda without any further rights under the Purchase Agreement, (b) Alameda also breached the Purchase Agreement, as amended by Amendment No. 3, and (c) the Massmans are entitled to the $100,000 Deposit as liquidated damages. In fact, the Massmans, by letter dated May 27, 2004, to the Escrow Holder, not only reminded the Escrow Holder that the Purchase Agreement had automatically terminated but also requested that the Escrow Holder then forward on to the Massmans the $100,000 Deposit; the Escrow Holder refused such instruction, presumably because of the dispute between Alameda and the Massmans as to (a) whether the Purchase Agreement had terminated, and (b) whom the $100,000 Deposit now belongs.

On June 10, 2004, the Massmans sued Alameda in California state court for the purpose of enforcing the Settlement Agreement, the Purchase Agreement, and Amendment No. 3 pursuant to the provisions of California Code of Civil Procedure § 664.6. The California state court stayed such action because of the pendency of the instant bankruptcy case. On or about February 14, 2005, Alameda amended its original complaint in the instant adversary

proceeding to its present form, following which the Massmans and the Debtor filed, respectively, their present counterclaims and crossclaims.

The Massmans presently move for summary judgment on each of the first eight counts in Alameda's amended complaint, as well as on each of the Massmans' counterclaims against Alameda. Counts 1—8 are the only counts for which the Massmans are named party defendants, and the Massmans are the sole named party defendants for each such count. Counts 1—8 may be summarized as follows:

(a) In Counts 1 and 2, Alameda sues the Massmans for breach of the Purchase Agreement, Amendment No. 3, and the Settlement Agreement, and seeks as a remedy either specific performance (Count 1) or money damages (Count 2). Alameda contends, in particular, that the Massmans breached such contractual documents by (i) failing to clear the *Lis Pendens* from the Title, (ii) failing to pursue stay relief on Alameda's behalf so that Alameda itself could then seek *ex parte* expungement of the *Lis Pendens*, (iii) failing, says Alameda, to promptly and fully cooperate with Alameda as required by Settlement Agreement ¶ 5(b)(i)— which lack of cooperation, the Court now understands Alameda to argue, is confined to the failure by the Massmans to clear the *Lis Pendens* and to pursue the aforesaid stay relief, and (iv) failing, and by continuing to refuse, to close, that is to convey to Alameda the Title in accordance with the Massmans' obligations (i.e., according to Alameda, conveyance of the Title free of the *Lis Pendens*). Alameda further contends that it is not in breach of any of the contractual documents but that, if it is, then the Purchase Agreement, as modified by Amendment No. 3, still could not have terminated because the Massmans have yet, pursuant to Settlement Agreement ¶ 6 and the Stipulation, to provide Alameda with ten days notice and the opportunity during such time to cure any default.

(b) In Counts 4 and 6, Alameda brings precisely the same breach of contract action against the Massmans that is brought in Counts 1 and 2, except that Alameda seeks, as relief in such former counts, rescission of Amendment No. 3 and the Settlement Agreement so that Alameda may then proceed against the Massmans under the Purchase Agreement in its unamended form. Alameda goes on to allege that the Massmans breached the Purchase Agreement prior to its amendment, and that such breach entitles Alameda to either specific performance (Count 4) or money damages (Count 6).

(c) In Count 7, Alameda sues the Massmans for breach of the duty or, more appropriately, the implied covenant of good faith and fair dealing, which implied covenant exists in each of the contractual documents.

(d) In Count 3, Alameda seeks declaratory relief to the effect that the Purchase Agreement, as modified by Amendment No. 3, has not yet terminated and, therefore, remains viable. In Count 5, Alameda seeks declaratory relief, subsequent to a requested rescission of Amendment No. 3 and the Settlement Agreement, to the effect that the Purchase Agreement, in its unamended form, has not yet terminated and, therefore, remains viable.

(e) In Count 8, Alameda sues the Massmans for fraud, and contends that

the Massmans falsely represented to Alameda that (i) the Massmans would expunge (i.e., clear) the *Lis Pendens* from the Title, (ii) the Massmans would seek and obtain stay relief on behalf of Alameda so that Alameda itself could so expunge the *Lis Pendens,* (iii) the Massmans would perform timely and in good faith their contractual obligations to Alameda, including selling and leasing the Realty to Alameda, and (iv) the Massmans would perform environmental work so that Alameda could lease the Realty.

The Massmans, by way of their counterclaims, contend that the Purchase Agreement, as modified by Amendment No. 3, has terminated, and that Alameda breached such agreements by failing to close on May 26, 2004. As relief, the Massmans seek (a) turnover of the $100,000 Deposit as liquidated damages (Counterclaim 1), (b) indemnification for, that is a recovery of, their attorneys' fees and court costs (Counterclaim 2), (c) return by Alameda of all building plans for the Realty that were previously delivered to Alameda (Counterclaim 4), and (d) declaratory relief to the effect that the amended Purchase Agreement has terminated, thereby leaving Alameda without any further rights (i) under the Purchase Agreement, and (ii) consequently in or to the Realty (Counterclaim 3).

In response to the Massmans' summary judgment motion, Alameda also argues, for the first time, that (a) the Massmans breached Settlement Agreement ¶ 5(b)(iii)(B)—(D) by virtue of the manner in which the Massmans resolved apparent defaults by the Debtor under the Air Nail Lease, which defaults were the subject of the stay relief motion by the Massmans that was dealt with at, and which was at least preliminarily settled by the time of, the May 18, 2004 hearing, and (b) such breach precludes the Massmans from being able to assert their release and indemnification rights under Settlement Agreement ¶¶ 2 and 10. Alameda also appears to argue that such breach entitles Alameda to rescind the Settlement Agreement and Amendment No. 3 so that they may then proceed against the Massmans under the Purchase Agreement in its unamended form. Alameda does not appear to argue, however, that its amended Purchase Agreement obligation to close by May 26, 2004, was conditioned upon the Massmans' performance of their obligation under Settlement Agreement ¶ 5(b)(iii)(B)—(D).

Alameda also informs all for the first time, in response to the Massmans' summary judgment motion, that the basis for Alameda's allegation, in Count 7, that the Massmans breached the implied covenant of good faith and fair dealing is that Alameda failed to expunge or to facilitate the expungement (i.e., obtain stay relief on behalf of Alameda so that Alameda could then seek expungement) of the *Lis Pendens* from the Title; Alameda also contends that the Massmans breached Settlement Agreement ¶ 8 for the same reasons, which contention follows since Alameda takes the position that said ¶ 8 is nothing more than an expression of the implied covenant of good faith and fair dealing. Alameda also contends that the Massmans, pursuant apparently to the application of some sort of estoppel theory, became burdened with an obligation to obtain (or pursue) such stay relief by virtue of their having allegedly voluntarily assumed such obligation (presumably on the ground that they made some sort of representation to that effect), coupled with alleged justifiable and detrimental reliance by Alameda.

## *DISCUSSION*

### I. *Subject Matter Jurisdiction.*

■ The Court's subject matter jurisdiction is not at issue, that is the parties

agree that the Court possesses subject matter jurisdiction over each of Alameda's Counts 1—8 and the Massmans' counterclaims. The foregoing notwithstanding, the Court independently holds that it possesses noncore, "related to" subject matter jurisdiction over all of the third party actions between Alameda and the Massmans. The Third Circuit has held that:

The ... test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*.... An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984) (emphasis in original) (citations omitted). The Third Circuit has also held that each cause of action must be analyzed separately to determine whether, and to what extent, a bankruptcy court has subject matter jurisdiction over such cause of action. *See Halper v. Halper,* 164 F.3d 830, 837 & 839 (3rd Cir.1999).

The Court holds that it has subject matter jurisdiction over the parties' contract breach and declaratory relief causes of action because, if Alameda does not prevail thereon, then it will lack standing to contest the validity of the Air Nail Lease via its instant Counts 9 and 10, thereby paving the way for the Debtor to assume such lease in the instant bankruptcy case; on the other hand, if Alameda prevails on

such causes of action, then such Counts 9 and 10 must be resolved, after which, if Alameda is successful, the Debtor would not be able to assume the Air Nail Lease.[2] The Court holds that it has subject matter jurisdiction over Alameda's fraud cause of action because, if Alameda were to prevail thereon, Alameda conceivably could obtain relief that might ultimately affect whether the Debtor could assume the Air Nail Lease—the Court holds that Alameda could conceivably obtain such relief if it were successful on its fraud cause of action because Alameda, in addition to asking for money damages in its Count 8, also asks therein for "such other relief to which Plaintiff may be entitled." Therefore, the Court possesses noncore, "related to" subject matter jurisdiction over each of Alameda's Counts 1—8 and the Massmans' counterclaims.

## II. Summary Judgment Standard and the Law Regarding Contract Interpretation.

The law regarding summary judgment adjudication is succinctly set forth as follows:

On a summary judgment motion, the movant must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Once the movant satisfies this initial burden, then the nonmovant must respond with information to the contrary or it will lose. Fed. R.Civ.P. 56(e).

**2.** When assessing the Court's subject matter jurisdiction, the Court analyzes separately the parties causes of action rather than their various counts. The Court conducts its analysis in such way (a) because, as is the case for certain of the counts for each of the parties, and as set forth above, such counts constitute

but one discrete cause of action notwithstanding that a different remedy is sought in each such count, *see supra* pp. 517–18, and (b) since, as *Halper* teaches, when assessing subject matter jurisdiction, a court must analyze a case claim-by-claim, not remedy-by-remedy.

... Where the movant is the defendant, or the party without the burden on the underlying claim, the movant has no obligation to produce evidence negating its opponent's case.

*National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1581–1582 (3rd Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 ([U.S.] 1986)). In resolving a summary judgment motion, "[t]he Court should determine whether there are [material] factual issues that merit a trial. . . . Summary judgment is appropriate if no [material] factual issues exist and the only issues before the court are legal." *EarthData International of North Carolina, L.L.C. v. STV Inc.,* 159 F.Supp.2d 844, 845 (E.D.Pa.2001).

■ Alameda's first eight counts and the Massmans' counterclaims, for which counts and counterclaims the Massmans seek summary judgment, turn primarily, if not entirely, upon issues of contract interpretation. The Purchase Agreement, Amendment No. 3, and the Settlement Agreement are to be interpreted and governed by and under California law. *See* Settlement Agreement ¶ 9; Purchase Agreement ¶ 23.2; Amendment No. 3 ¶ AM3–12. In California, "[w]here a contract is clear and unambiguous, it is interpreted by the language therein without resort to extrinsic evidence. . . . Such interpretation is [accordingly] a question of law." *Niederer v. Ferreira,* 189 Cal. App.3d 1485, 234 Cal.Rptr. 779, 787 (1987); *see also Molybdenum Corp. of America v. Kasey,* 176 Cal.App.2d 357, 1 Cal.Rptr. 400, 404 (1960) (same); *Lane–Wells Co. v. Schlumberger Well Surveying Corp.,* 65 Cal.App.2d 180, 150 P.2d 251, 253 (1944) (if contract is unambiguous, "[i]ts construction . . . must be derived solely from the language within its borders"); Cal.Civ. Code § 1638 (West 2005) ("The language

of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"); *Ede v. Ede,* 208 Cal.App.2d 718, 25 Cal.Rptr. 576, 577 (1962) (same); *Industrial Indemnity v. Superior Court,* 224 Cal.App.3d 828, 275 Cal.Rptr. 218, 219 (1990) (same). That being the case, "[t]he [C]ourt can grant summary judgment on an issue of contract interpretation [in the instant matter] if the contractual language being interpreted [is unambiguous, that] 'is subject to only one reasonable interpretation.'" *Emerson Radio Corp. v. Orion Sales, Inc.,* 253 F.3d 159, 163–164 (3rd Cir.2001) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,* 180 F.3d 518, 521 (3rd Cir. 1999)); *see also LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1073 (3rd Cir.1996) (same); *W.B. v. Matula,* 67 F.3d 484, 497 (3rd Cir.1995) (same); *EarthData,* 159 F.Supp.2d at 845 (same); *Niederer,* 234 Cal.Rptr. at 787 (same).

■ "The initial determination of whether terms are ambiguous is itself a question of law," *Matula,* 67 F.3d at 497 (citing *St. Paul Fire and Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 (3rd Cir. 1991)); *see also Seidenberg v. Mutual Life Insurance Co. of New York,* 949 F.Supp. 269, 274 (D.N.J.1996) (same); *Niederer,* 234 Cal.Rptr. at 787 (same); *Industrial Indemnity,* 275 Cal.Rptr. at 220 (same), which means that such issue may also be dealt with via a summary judgment motion. "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1406 (9th Cir.1985).

■■ In the instant matter, issues exist regarding whether certain contractual obligations, if they even exist, constitute conditions precedent (i.e., obligations that must be performed first before rights dependent thereon accrue or acts dependent

thereon are due to be performed) or merely covenants (i.e., obligations upon which neither rights nor subsequent performance are dependent). In California, "it is the general rule in contract interpretation that stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language." *Alpha Beta Food Markets v. Retail Clerks Union Local 770*, 45 Cal.2d 764, 291 P.2d 433, 437 (1955); *see also Frankel v. Board of Dental Examiners*, 46 Cal.App.4th 534, 54 Cal. Rptr.2d 128, 137–138 (1996) (same); *In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1264 (9th Cir.1982) (applying California law, same); *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1444 (9th Cir.1986) (applying California law, same); *Hasso v. Hasso*, 229 Cal.App.3d 1174, 280 Cal.Rptr. 919, 923 (1991) (contractual provisions not construed as conditions precedent in "absence of language plainly requiring such a construction"); *Larson v. Thoresen*, 116 Cal.App.2d 790, 254 P.2d 656, 658 (1953) (same); *Helzel v. Superior Court of Alameda County*, 123 Cal.App.3d 652, 176 Cal.Rptr. 740, 745–746 (1981) (same); *Pacific Allied v. Century Steel Products, Inc.*, 162 Cal.App.2d 70, 327 P.2d 547, 553 (1958) (same). Consequently, if an ambiguity exists as to whether a contractual obligation constitutes a condition precedent, such obligation, as a matter of law in California, must be construed as but a mere covenant and not a condition precedent. That being the case, whether a contractual obligation constitutes a condition precedent or merely a covenant in the instant matter is particularly appropriate for resolution via a summary judgment motion.

### III. *The Law Regarding Breach of Contract, Contract Breach Remedies, and the Implied Covenant of Good Faith and Fair Dealing.*

■ "Under California law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting damage to plaintiff." *EPIS, Inc. v. Fidelity and Guaranty Life Insurance Co.*, 156 F.Supp.2d 1116, 1124 (N.D.Cal. 2001) (citing *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 69 Cal.Rptr. 321, 442 P.2d 377 (1968)); *see also* 14pt1 Cal. Jur.3d *Contracts* § 316 (West 2005) (same).

■ If neither a defendant's obligation to perform nor a plaintiff's contractual right are conditioned upon the performance by such plaintiff of its own obligation, then such plaintiff may, contrary to the general rule just set forth, sue for such defendant's breach (i.e., failure to perform its obligation) or seek to enforce such plaintiff's contractual right notwithstanding that such plaintiff has failed to perform and has not been excused from such failure to perform its own particular contractual obligation; such defendant can recover for such plaintiff's breach via recoupment or counterclaim. *See Kaupke v. Lemoore Canal & Irrigation Co.*, 20 Cal. App.2d 554, 67 P.2d 407, 409–410 (1937) (because defendant's obligation to pay water assessments was not conditioned upon plaintiff's performance of its obligation to deliver water and to prosecute or defend lawsuits, plaintiff's failure to perform its aforesaid obligation did not preclude it from suing defendant for defendant's failure to pay water assessments); *Verdier v. Verdier*, 133 Cal.App.2d 325, 284 P.2d 94, 99–101 (1955) (because plaintiff's right to support payments was not conditioned upon compliance by her with the provision against molestation, that she molested defendant does not preclude her from obtaining such support payments).

■ With respect to contract rescission, " '[i]f the covenant [that has been

breached] be of minor importance, not going to the root of the matter, and one that can readily be compensated in damages, the party injured cannot rescind, but must perform his part of the contract and seek compensation in damages.'" *I.J. Ely v. Bottini*, 179 Cal.App.2d 287, 3 Cal.Rptr. 756, 762 (1960); *see also Integrated, Inc. v. Alec Fergusson Electrical Contractors*, 250 Cal.App.2d 287, 58 Cal.Rptr. 503, 509–510 (1967) (same); *Federal Deposit Ins. Corp. v. Air Florida System, Inc.*, 822 F.2d 833, 840 (9th Cir.1987) (same); 17A Am.Jur.2d *Contracts* § 561 (West 2005) ("Rescission is not permitted for a minor, casual, trivial, technical, or unimportant breach; or for a breach which is collateral, or incidental and subordinate, to the real undertaking or main purpose of the contract").

In California,

"[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." However, the "covenant thus cannot be endowed with an existence independent of its contractual underpinnings." Therefore, it "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."

Additionally, as to acts authorized by the express provisions of the contract, no covenant of good faith can be implied which would forbid those express acts. *EPIS*, 156 F.Supp.2d at 1127 (citations omitted); *see also Los Angeles Equestrian Center, Inc. v. City of Los Angeles*, 17 Cal.App.4th 432, 21 Cal.Rptr.2d 313, 323 (1993) (same); *McWilliams v. Holton*, 248 Cal.App.2d 447, 56 Cal.Rptr. 574, 577 (1967) (same); *Agosta v. Astor*, 120 Cal. App.4th 596, 15 Cal.Rptr.3d 565, 572–573 (2004) (same).

**IV.** *Interpretation of the Purchase Agreement, Amendment No. 3, and the Settlement Agreement.[3]*

 **A.** *Whether the Massmans had an obligation to clear the Lis Pendens from the Title, and if so, whether satisfaction of such obligation was a condition precedent to Alameda's obligation to close by May 26, 2004?*

Alameda maintains not only that the Massmans had an obligation to clear the *Lis Pendens* from the Title but also that satisfaction of such obligation constituted a condition precedent to performance by Alameda of its obligation to close by May 26, 2004. The Massmans, on the other hand, argue for precisely the contrary, that is that, after execution of Amendment No. 3 and the Settlement Agreement on March 1, 2004, they no longer had any obligation to clear the Title of any such defect. For several reasons set forth below, the Court can conclude, at the summary judgment stage, that the Massmans did not have any obligation to clear the *Lis Pendens* from the Title.

First, the Court understands Alameda to argue that Amendment No. 3 ¶ AM3–4 created an obligation on the part of the Massmans to clear the Title of defects other than those that, pursuant to

---

**3.** Because Alameda's Counts 1—8 and the Massmans' counterclaims all constitute non-core matters, and since the foregoing are the only parts of the instant adversary proceeding that are dealt with via the Massmans' summary judgment motion and, thus, within the instant opinion, all of the Court's holdings, rulings, and orders that are set forth in parts IV. and V. below constitute proposals to the District Court, which shall enter final judgment.

¶ AM3–4, were expressly permitted to remain showing on the Title Commitment. If ¶ AM3–4 served to create such an obligation, however, it could only have done so by implication given that such paragraph, by its language, clearly fails to express such an obligation; instead, ¶ AM3–4, by its language, does nothing more than to condition Alameda's obligation to close by May 26, 2004, upon the Title being free from defects other than those that, pursuant to ¶ AM3–4, were expressly permitted to remain. Unfortunately for Alameda, that its obligation to close was conditioned upon the Title being free from such defects does not also imply that the Massmans were obligated to rid the Title of such defects. Therefore, the Court finds that ¶ AM3–4 is unambiguous in the sense that it did not obligate the Massmans to clear the Title of unpermitted defects, presuming *arguendo* that the *Lis Pendens* was such an unpermitted defect. The Court does not understand Alameda to point to any other provision in Amendment No. 3 as creating an obligation on the Massmans' part to clear the *Lis Pendens* from the Title, and the Court itself does not identify any other such provision.

■ Second, even if the Court were to find that Amendment No. 3 ¶ AM3–4 was ambiguous as to whether it created an obligation on the part of the Massmans to clear the Title of defects other than those that, pursuant to ¶ AM3–4, were expressly permitted to remain showing on the Title Commitment, the grant of summary judgment in the Massmans' favor would nevertheless remain warranted given that such obligation, in any event would not have imposed upon the Massmans a duty to rid the Title of the *Lis Pendens*. The Court so concludes because the Court concludes,

in turn and for the reasons set forth below, that the *Lis Pendens* is a title defect that, pursuant to ¶ AM3–4(v)[4] and (vii), was expressly—and unambiguously so—permitted to remain showing on the Title Commitment, *see infra* pp. 535–36.

■ Third, and although not argued by Alameda, the Court considers whether any provision in the original Purchase Agreement operated to saddle the Massmans with an obligation to clear the Title of unpermitted defects—such is a possibility given that the terms of the Purchase Agreement, pursuant to Amendment No. 3 ¶ AM3–12, remained effective except to the extent that they were rendered inoperative by Amendment No. 3. The lone provision in the Purchase Agreement that could have served to impose such an obligation on the Massmans is Purchase Agreement ¶ 9.1(f). Said ¶ 9.1(f) provides generally that the Massmans were obligated to clear the Title of any monetary encumbrance (i.e., title defect) that was disapproved of by Alameda within ten days after Alameda received a copy of the Title Commitment from the Escrow Holder, provided that Alameda notified the Escrow Holder in writing of such disapproval within such ten-day period. In fact, Alameda appears to have operated under the presumption that said ¶ 9.1(f) continued to control shortly before May 26, 2004, as evidenced by Alameda's letter dated May 20, 2004, to the Escrow Holder, wherein Alameda noted its disapproval of the *Lis Pendens* that was contained in the copy of the Title Commitment that issued seven days earlier. Unfortunately for Alameda, said ¶ 9.1(f), after execution of Amendment No. 3 and the Settlement Agreement on March 1, 2004, unambiguously no longer operated to impose upon the Massmans an obli-

---

4. Amendment No. 3 ¶ AM3–4 actually contains two clauses numbered (vi) and none that are numbered (v). So as to distinguish between the two clauses that are numbered (vi), the Court shall henceforth refer to the first of such clauses as (v).

gation to clear the Title of disapproved defects. The Court so concludes (a) because, according to said ¶ 9.1(f), *the only title defects that the Massmans were thereby obligated to clear from the Title were those that were disapproved of by Alameda*, (b) because, according to Purchase Agreement ¶ 9.1, such disapproved title defects—or, rather, the removal of such defects—constituted a contingency to closing upon the satisfaction or waiver of which closing to a sale of the Realty was conditioned, and (c) because, according to Amendment No. 3 ¶ AM3–5, Alameda "acknowledges and agrees ... that all of the contingencies to the Closing set forth in Paragraph 9 of the Purchase Agreement have been satisfied or waived, and therefore are deemed approved."

Fourth, even if the Court were to find that the Massmans' obligation under Purchase Agreement ¶ 9.1(f) to clear disapproved title defects had survived the March 1, 2004 execution of Amendment No. 3 and the Settlement Agreement (or that an ambiguity existed as to the survival of such obligation), such obligation nevertheless would not have imposed upon the Massmans a duty to rid the Title of the *Lis Pendens*. The Court so concludes because (a) said ¶ 9.1(f) only allowed Alameda to disapprove, and only obligated the Massmans to clear the Title, of a title defect "which by the terms of this Agreement is not to remain against the Property after the Closing," and (b) the Court concludes, in turn and for the reasons set forth below, that the *Lis Pendens* is a title defect that Alameda, pursuant to Amendment No. 3 ¶ AM3–4(v) and (vii), unambiguously agreed would remain against the Realty after closing on May 26, 2004, *see infra* pp. 535–36.[5]

Fifth, the Court understands Alameda to perhaps argue that two provisions in the Settlement Agreement, namely ¶¶ 5(b)(i) and 8 therein, operated to place upon the Massmans the duty to clear the Title of the *Lis Pendens*. The Court flatly disagrees. First, said ¶ 5(b)(i) only imposed upon the Massmans the duty to cooperate with Alameda in connection with

---

5. As an aside, the Court notes that, even if the Massmans' obligation under Purchase Agreement ¶ 9.1(f) to clear disapproved title defects had survived past March 1, 2004, up until May 26, 2004, and even if the *Lis Pendens* was properly a disapproved title defect, the Massmans still would not have breached the amended Purchase Agreement by failing to clear the Title of the *Lis Pendens*. The Court so rules because, if the foregoing were the case, then, pursuant to Purchase Agreement ¶ 9.3, the Massmans would nevertheless have had a right to elect to not clear the Title of the *Lis Pendens*, which election they would be deemed to have made by virtue of their having failed to provide a particular written notice to Alameda within a particular 10–day period. Given such right to not so clear the Title, the Massmans would not have been found to have breached the Purchase Agreement by electing to take advantage of such right; the Massmans would also not be found to have violated the implied covenant of good faith and fair dealing by taking advantage of

such right, *see supra* p. 529. Continuing on, if Purchase Agreement ¶ 9 applied up until May 26, 2004, then Alameda, pursuant to ¶ 9.3, would then have had the right to elect either to accept the Title subject to the *Lis Pendens* or to terminate the Purchase Agreement; by virtue of their not having given the Massmans a written notice electing to take the Title subject to the *Lis Pendens* without deduction or offset, Alameda would be deemed to have elected to terminate the Purchase Agreement. Therefore, if ¶ 9.1(f) had applied up until May 26, 2004, and if the *Lis Pendens* was properly a disapproved title defect, then (a) the Massmans would not have been in breach by failing to clear the Title of the *Lis Pendens*, (b) the Purchase Agreement would have terminated, but without any breach by Alameda either, (c) specific performance of the Purchase Agreement would not have been a possible remedy for Alameda, but (d) Alameda would not have suffered a loss of the $100,000 Deposit as liquidated damages, *see infra* p. 541.

legal action that *Alameda*, rather than the *Massmans*, was to take with respect to the Air Nail Lease. The Court finds that said paragraph is unambiguous in the sense that it did not impose upon the Massmans an obligation to themselves take legal action; such conclusion also follows from the clause near the end of such paragraph to the effect "that such cooperation [by the Massmans] is [to be] at no additional liability or cost to the Massmans." Second, said ¶ 8, to the extent that such paragraph is, as Alameda itself contends, an express covenant of good faith and fair dealing, necessarily cannot, for the reasons set forth in the next paragraph herein (which deals with the implied covenant of good faith and fair dealing), be found to have imposed upon the Massmans an obligation to clear the Title of the *Lis Pendens*. Focusing on the precise language of said ¶ 8, such paragraph cannot be construed to have imposed upon the Massmans an obligation to clear the Title of the *Lis Pendens* (or any title defect for that matter), given that the purpose of the Settlement Agreement, which purpose said ¶ 8 requires each party to effectuate, was to effect a purchase/sale of the Realty in accordance with the terms and conditions of the amended Purchase Agreement, that is a purchase/sale without any concomitant obligation by the Massmans to clear the Title of the *Lis Pendens* (or any title defect for that matter).

Finally, Alameda argues that the implied covenant of good faith and fair dealing, which implied covenant is found, as a matter of law, to exist in each of the three agreements between the parties, imposed an obligation upon the Massmans to clear the *Lis Pendens* from the Title. Unfortunately for Alameda, (a) the implied covenant of good faith and fair dealing, as set forth above, cannot, as a matter of law, impose a substantive duty on the Mass-

mans that is not incorporated into the specific terms of the parties' agreements, *see supra* p. 529, (b) none of the parties' three agreements, as set forth above, contain provisions that operated to place upon the Massmans an obligation to clear the Title of the *Lis Pendens*, *see supra* pp. 529–31, and (c) the implied covenant of good faith and fair dealing that is found in the each of the parties' three agreements, thus, did not itself operate to impose upon the Massmans an obligation to clear the Title of the *Lis Pendens*.

In light of all of the foregoing, the Court can conclude, at the summary judgment stage, that (a) neither a covenant nor a condition precedent to performance by Alameda of its obligation to close by May 26, 2004, existed to the effect that the Massmans would clear the Title of the *Lis Pendens*, and (b) the Massmans did not breach of any of the three agreements between the parties by not clearing the Title of the *Lis Pendens*.

**B.** ***Whether the Massmans had an obligation to obtain (or pursue) stay relief on Alameda's behalf so as to facilitate expungement of the Lis Pendens, and if so, whether satisfaction of such obligation was a condition precedent to Alameda's obligation to close by May 26, 2004?***

Alameda maintains that the Massmans had an obligation to obtain (or pursue) stay relief on Alameda's behalf so as to facilitate subsequent *ex parte* expungement of the *Lis Pendens* by Alameda in California Superior Court. The Court is uncertain whether Alameda also contends that satisfaction of such obligation constituted a condition precedent to performance by Alameda of its obligation to close by May 26, 2004. The Massmans, on the other hand, argue for precisely the con-

trary, that is that they never had any obligation to obtain such stay relief on Alameda's behalf. For several reasons set forth below, the Court can conclude, at the summary judgment stage, that the Massmans did not have an obligation to obtain (or pursue) stay relief on Alameda's behalf so as to facilitate subsequent *ex parte* expungement of the *Lis Pendens* by Alameda in California Superior Court.

First, Alameda contends that Settlement Agreement ¶ 5(b)(i) operated to place upon the Massmans the duty to obtain (or pursue) such stay relief. Unfortunately for Alameda, the Court finds, as set forth above, that said paragraph is unambiguous in the sense that it did not impose upon the Massmans an obligation to themselves take legal action, *see supra* p. 531, even if such legal action was only to be taken in connection with other legal action that Alameda itself then contemplated taking with respect to the Air Nail Lease. Put differently, the type of cooperation with Alameda to which the Massmans were obligated under said ¶ 5(b)(i) unambiguously did not include the taking of any legal action by the Massmans themselves, such as, for instance, the obtaining (or pursuit) of stay relief. Therefore, said ¶ 5(b)(i) did not operate to impose upon the Massmans an obligation to obtain (or) pursue stay relief on Alameda's behalf.

Second, Alameda argues that Settlement Agreement ¶ 8 also served to impose upon the Massmans an obligation to obtain (or pursue) such stay relief. The Court disagrees. As an initial matter, said ¶ 8, to the extent that it is, as Alameda itself contends, an express covenant of good faith and fair dealing, necessarily cannot be found to have imposed upon the Massmans an obligation to obtain (or pursue) such stay relief. The Court so rules (a) because, as is the case with respect to the implied covenant of good faith and fair

dealing, such a covenant, as set forth above, cannot, as a matter of law, impose on the Massmans a substantive duty that is not incorporated into the specific terms of the parties' agreements, *see supra* p. 530, (b) since Alameda fails to even argue that any provision of the amended Purchase Agreement operated to impose on the Massmans an obligation to obtain (or pursue) such stay relief, and (c) given that Alameda fails to point to any other provision of the Settlement Agreement to support its position save ¶ 5(b)(i) therein, which provision, as just set forth in the preceding paragraph herein, did not operate to impose on the Massmans such an obligation. Focusing next on the precise language of said ¶ 8, such paragraph cannot be construed to have imposed upon the Massmans an obligation to obtain such stay relief given that the purpose of the Settlement Agreement, which purpose said ¶ 8 requires each party to effectuate, was to effect a purchase/sale of the Realty, essentially subject to a title exception like the *Lis Pendens, see infra* pp. 535–36. Because such purpose was to effect a purchase/sale of the Realty subject to a title exception like the *Lis Pendens,* expungement, or the pursuit or obtaining of stay relief to facilitate expungement, of such title exception would have done nothing to further, or to carry out, such purpose; indeed, obtaining (or pursuing) such stay relief would have done nothing more than to placate Alameda, which placation is obviously neither a purpose itself, nor, as just stated, would have operated to further in any way the actual purpose, of the Agreement.

Third, Alameda maintains that an obligation to obtain (or pursue) such stay relief arose by virtue of the aforesaid implied covenant of good faith and fair dealing that is found to exist in each of the three agreements between the parties. Such ar-

gument fails, of course, for the reason, as just set forth in the preceding paragraph, that Settlement Agreement ¶ 8, as an express covenant of good faith and fair dealing, failed to impose upon the Massmans an obligation to obtain (or pursue) such stay relief.

■■■ Fourth, the Court holds that, even if an express or implied contractual provision operated to impose upon the Massmans an obligation to actively assist Alameda in the expungement of the *Lis Pendens*, such provision did not thereby require the Massmans to undertake utterly nonsensical action such as, for instance, the bringing of a stay relief motion on behalf of Alameda so that Alameda could then have attempted to accomplish in another court, on an *ex parte* basis against the Debtor, what Alameda could have attempted to directly accomplish in this Court, that is the expungement of the *Lis Pendens*. The Court holds that the pursuit of such stay relief would have been nonsensical for at least three reasons. First, any stay relief that this Court—and, most likely, any bankruptcy court—would ever grant to a stay relief movant would not have the effect of then immunizing subsequent acts by a nonmovant against a debtor in bankruptcy. Such is the case because this Court—and, most likely, any other bankruptcy court—would not fashion a grant of stay relief that would operate to benefit an entity that does not see fit itself to move for stay relief. Accordingly, the pursuit of stay relief on behalf of someone else, for any purpose, constitutes, in this Court's view, a futile act. Second, Califor-

nia Code of Civil Procedure § 405.30 makes clear that, if anyone wished to apply for expungement of the *Lis Pendens,* then such application needed to be made in this Court. The Court so rules because (a) § 405.30 provides that, "[a]t any time after notice of a pendency of action has been recorded, any party . . . may apply to the court in which the action is pending to expunge the notice," Cal.Civ.Proc.Code § 405.30 (West 2005), and (b) the court in which is pending the action that is described in the *Lis Pendens* is this Court.[6] Because this Court is the one in which, by virtue of § 405.30, such application for expungement needed to be made, it would have been senseless for Alameda itself, let alone the Massmans on Alameda's behalf, to move for stay relief for the purpose of seeking expungement of the *Lis Pendens.*[7] Third, this Court is—and presumably other bankruptcy courts are—not inclined to grant stay relief so that action can then be taken against a debtor in bankruptcy on an *ex parte* basis, particularly when such action could be taken in this Court on notice to such debtor. Therefore, and even presuming *arguendo* that *ex parte* expungement of a *lis pendens* is generally obtainable in the California state courts (and even in the instance when the action described in such *lis pendens* is pending in a court other than a California state court) when a debtor in bankruptcy is not involved, it would have been nonsensical for Alameda itself, let alone the Massmans on Alameda's behalf, to move for stay relief for the purpose of seeking *ex parte* expungement of the *Lis Pendens.*

---

6. A bankruptcy court has jurisdiction to expunge a *lis pendens* if such court is the court in which is pending the action that is described in such *lis pendens. See In re Thatcher,* 24 B.R. 764, 766 (Bankr.E.D.Cal.1982); *In re Weston,* 110 B.R. 452, 459–460 (E.D.Cal. 1989); *In re The Brickyard,* 735 F.2d 1154, 1158 n. 7 (9th Cir.1984).

7. Because Alameda is, of course, a party to the instant adversary proceeding, which proceeding is the action which is described in the *Lis Pendens,* Alameda clearly had standing itself to seek to expunge the *Lis Pendens* in this Court pursuant to § 405.30.

■ Finally, various contractual provisions found in the three agreements between the parties unambiguously operate to defeat Alameda's position—not based in any way upon provisions in such agreements but rather apparently upon the application of some sort of estoppel theory—that the Massmans became burdened with an obligation to obtain (or pursue) such stay relief by virtue of their having allegedly voluntarily assumed such obligation (presumably on the ground that they made some sort of representation to that effect), coupled with alleged justifiable and detrimental reliance by Alameda. In particular, the Court finds that Settlement Agreement ¶ 2(a) and (c) unambiguously operates to release the Massmans from (a) any such voluntarily assumed undertaking or obligation, presuming *arguendo* that the same existed, and (b) any claim or cause of action predicated upon such a voluntarily assumed obligation.[8] With respect to such release, the Court understands Alameda to argue that the Massmans cannot take advantage of such release on the basis that they breached the Settlement Agreement. As set forth more fully below, the Court finds that the only provision in the Settlement Agreement that the Massmans might have conceivably breached is ¶ 5(b)(iii)(B)—(D), and that, even presuming *arguendo* the existence of such breach, the Massmans may nevertheless take full advantage of such release contained therein, *see infra* pp. 538–39. The Court also finds that the integration clause in the Settlement Agreement, *see* Settlement Agreement ¶ 14, the provision against oral modification contained in the Settlement Agreement, *see Id.* at ¶ 15, and the "No Representation or Warranties" provision found in Amendment No. 3, *see* Amendment No. 3 ¶ AM3–3, unambiguously serve to preclude (a) the Massmans from being bound by any such voluntarily assumed undertaking or obligation, once again presuming *arguendo* that the same existed, and (b) any supposed reliance by Alameda upon such voluntary assumption from being justifiable.[9]

8. Settlement Agreement ¶ 2(a) provides, in pertinent part, that:

... Alameda hereby releases, discharges and acquits the Massmans ... of and from any and all claims, demands, sums of money, damages, expenses, losses, duties, actions, rights, causes of action, agreements, promises, undertakings, liens, obligations and liabilities of any kind, nature or character whatsoever, whether known or unknown, fixed or contingent, which Alameda has had or claims to have had, now has or claims to have, or hereafter may have or claim to have, which arise out of or are in any manner whatsoever, directly or indirectly, connected with or related to:

(i) The Property;
(ii) The Action;
(iii) The subject matter of the Action;
(iv) Any of the facts referred to in the Recitals in this Agreement, or any causes of action or claims arising therefrom or related thereto; and/or
(v) Any act, omission, transaction, communication, dealing, conduct or negotiation of any kind whatsoever by the Massman Releasees, or any of them, or by anyone acting or purporting to act on their behalf, related to or connected in any way with any of the matters set forth in subsections 2(a)(i) through (iv) above.

Settlement Agreement ¶ 2(c) provides, in pertinent part, that:

Alameda hereby waives the provisions of ... Section 1542 [of the California Civil Code, which statute provides that a general release does not extend to claims which a creditor is unaware exist in his favor at the time of execution of such release] and the provisions of any other applicable laws restricting the release of claims which the releasing party does not know or suspect to exist at the time of release, which, if known, would have materially affected their decision to agree to this release.

9. The Court, after having read all of Alameda's papers, is also left with the impression that Alameda contends that the Massmans violated the implied covenant of good faith

In light of all of the foregoing, the Court can conclude, at the summary judgment stage, that (a) neither a covenant nor a condition precedent to performance by Alameda of its obligation to close by May 26, 2004, existed to the effect that the Massmans would obtain (or pursue) stay relief on Alameda's behalf so as to facilitate expungement of the *Lis Pendens*, and (b) the Massmans did not breach of any of the three agreements between the parties by failing to obtain (or pursue) such stay relief.

**C.** *Whether Amendment No. 3 ¶ AM3–4 unambiguously provides that the Lis Pendens is a title defect that was permitted to remain showing on the Title Commitment?*

Amendment No. 3 ¶ AM3–4 provides for a condition to Alameda's obligation to close, namely that the updated Title Commitment show nothing other than the seven additional title exceptions set forth in said ¶ AM3–4(i)—(vii). Alameda contends that the *Lis Pendens* does not fall within the description for any of such additional title exceptions, and that such descriptions are ambiguous in any event so as to preclude a finding at the summary judgment stage that the *Lis Pendens* falls within any of such descriptions. For several reasons set forth below, the Court disagrees.

First, the Court can accept, as Alameda argues, that the description in ¶ AM3–4(i), to wit "the Air Nail Lease," is ambiguous such that the Court cannot presently conclude that such description captures within its reach the *Lis Pendens*. Second, the

Court likewise is skeptical as to whether, and finds in any event that it may not presently conclude that, the description contained in the first portion of ¶ AM3–4(v), to wit "the pending Action," captures within its reach the *Lis Pendens*—the Court so rules because "the pending Action" so described is that which was commenced by Alameda on or about February 11, 2003, in Los Angeles Superior Court, and then dismissed without prejudice on February 26, 2004 (i.e., the California Action), rather than the instant adversary proceeding, which latter action is that which is described in the *Lis Pendens*.

However, the Court must conclude that the descriptions contained in the second portions, respectively, of ¶ AM3–4(v) (i.e., "any other title exceptions arising by reason of the acts or omissions of Buyer") and (vii) (i.e., "any other exceptions ... otherwise created by Buyer's acts or omissions") unambiguously capture within their reach the *Lis Pendens*. The Court so rules because the *Lis Pendens* arose by reason of, that is was created by, an act of Alameda, at least in part, namely the institution by Alameda of the instant adversary proceeding against the Debtor, who ultimately proceeded to file the *Lis Pendens* which describes such lawsuit. In so ruling, the Court necessarily construes the aforesaid descriptions contained in ¶ AM3–4(v) and (vii) to be unambiguous in the sense that they both capture within their reach title exceptions that *at least partially* arose, or that were *at least partially* created, by reason of an act or omission of Alameda. Such construction is unambigu-

---

and fair dealing by not carrying out such voluntarily assumed, *noncontractual* obligation to obtain (or pursue) such stay relief. If the Court is correct that Alameda argues as much, then such argument must be rejected, as a matter of law, because, as set forth above, such implied " 'covenant [(a)] ... can-

not be endowed with an existence independent of its contractual underpinnings[,]' [and (b)] ... 'cannot impose substantive duties ... on the contracting parties beyond those incorporated in the specific terms of their agreement.' " *See supra* p. 530.

ously called for, the Court rules, because (a) neither the word "arising" nor the word "created" is preceded in ¶ AM3–4(v) and (vii) by the qualifying word "solely," and (b) if the words "arising" or "created" were so qualified, then it would be exceedingly easy for Alameda to prevent satisfaction of the condition contained in ¶ AM3–4 to its obligation to close—indeed, one can always argue, as does Alameda in the instant matter,[10] that someone else also played a part in the creation of a particular title exception.

Therefore, Amendment No. 3 ¶ AM3–4—and, in particular, ¶ AM3–4(v) and (vii)—unambiguously provides that the *Lis Pendens* is a title defect that was permitted to remain showing on the Title Commitment. Consequently, the presence of the *Lis Pendens* on the Title Commitment did not prevent satisfaction of the condition to Alameda's obligation to close contained in ¶ AM3–4. Because Alameda does not advance any other argument that such condition was not met, such condition was, in fact, met, which means that (a) Alameda's failure to close by May 26, 2004, was unexcused, and (b) Alameda breached the Purchase Agreement and Amendment No. 3 by not so closing.[11]

**D.** ***Whether the Massmans are obligated, pursuant to Settlement Agreement ¶ 6 and the Stipulation, to provide Alameda with ten days notice and the opportunity during such time to cure any default before the amended Purchase Agreement could automatically terminate?***

██ As just set forth above, the Court concludes that Alameda defaulted under the amended Purchase Agreement by failing to close by May 26, 2004. Alameda contends that, even if it has so defaulted, the Purchase Agreement, as modified by Amendment No. 3, still could not have automatically terminated because the Massmans have yet, pursuant to Settlement Agreement ¶ 6 and the Stipulation, to provide Alameda with ten days notice and the opportunity during such time to cure such default. The Massmans, on the other hand, contend that they need not provide such notice and opportunity to cure if they seek to enforce the parties' three agreements, that is if they seek to sue Alameda on a contractual default, via a method other than suit pursuant to California Code of Civil Procedure § 664.6.

---

**10.** Alameda argues in the instant matter, for instance, that the Massmans actually caused the *Lis Pendens* to materialize because, argues Alameda in turn, the Massmans (a) served upon the Debtor a notice of sale so as to activate the Debtor's Right of First Refusal, which notice, according to Alameda, somehow provoked the Debtor to then file the *Lis Pendens,* and (b) leased the Realty to the Debtor, which act—an improper one, according to Alameda—prompted Alameda to sue the Debtor, which suit, in turn, incited the Debtor to file the *Lis Pendens.* So easy is such an argument to make that one could imagine, even if it were Alameda itself rather than the Debtor that had filed the *Lis Pendens,* that Alameda would nevertheless argue that the Massmans caused such filing of the *Lis Pendens* (i.e., the Massmans' actions provoked

Alameda such that it then filed the *Lis Pendens*).

**11.** As an aside, the Court notes that, even if the *Lis Pendens* were not a title defect that was permitted to remain showing on the Title Commitment, such would only have then meant that Alameda did not breach the Purchase Agreement by failing to close by May 26, 2004, and that Alameda would not have suffered a loss of the $100,000 Deposit as liquidated damages, *see infra* p. 541; such would not have compelled a finding, for instance, that the Massmans had breached by failing to rid the Title of the *Lis Pendens,* or that the Purchase Agreement remained viable (i.e., that such agreement had not automatically terminated).

The Court holds that Settlement Agreement ¶ 6 and the Stipulation unambiguously provide that such notice and opportunity to cure need be provided to a defaulting party only as part of the process for the bringing of a suit against said defaulting party pursuant to California Code of Civil Procedure § 664.6. Therefore, if the nondefaulting party pursues a suit against the defaulting party other than via said § 664.6,[12] then the nondefaulting party need not provide such notice and opportunity to cure. Because the Massmans presently seek to enforce the parties' three agreements, that is presently seek to recover against Alameda on a contractual default, via the instant adversary proceeding, which proceeding is undoubtedly not brought pursuant to California Code of Civil Procedure § 664.6, the Massmans need not provide Alameda with the ten days notice and opportunity to cure that is described in Settlement Agreement ¶ 6 and the Stipulation. Consequently, that the Massmans have not provided Alameda with the ten days notice and opportunity to cure that is described in Settlement Agreement ¶ 6 and the Stipulation does not constitute a roadblock to, that is it does not operate to prevent, the automatic termination of the Purchase Agreement pursuant to Amendment No. 3 ¶ AM3–1.

### E. Whether it was the fault of the Massmans that the closing did not occur on May 26, 2004?

Alameda maintains that the closing did not occur on May 26, 2004, due to the fault of the Massmans rather than itself. Accordingly, Alameda contends that, pursuant to Amendment No. 3 ¶ AM3–1, the Purchase Agreement has not yet terminated. The Massmans contend, on the other hand, that the failure to so close was not due to any fault on their part and that, accordingly, the Purchase Agreement has, pursuant to Amendment No. 3 ¶ AM3–1, automatically terminated.

The Court holds that the Massmans could not have been at fault regarding the aforesaid failure to close on the basis of a failure to clear the *Lis Pendens* from the Title, or on the basis of a failure to obtain (or pursue) stay relief that might have facilitated such removal, because, as set forth above, the Massmans were neither obligated to perform such acts nor, consequently, were in breach of any of the parties' three agreements for their failure to perform such acts, see *supra* pp. 532 & 535.

The Court holds as well that the Massmans were not at fault for the failure of Alameda to close even presuming *arguendo* that the Massmans, as Alameda argues, defaulted on Settlement Agmt. ¶ 5(b)(iii)(B)—(D); Alameda argues that the Massmans so defaulted by virtue of the manner in which they settled with the Debtor apparent defaults by the Debtor under the Air Nail Lease, which defaults were the subject of the Massmans' stay relief motion dealt with at the May 18, 2004 hearing. The Court so holds because—and the Court does not even understand Alameda to dispute that—the

---

**12.** "A motion pursuant to Code Civ. Proc. § 664.6 is not the exclusive means of enforcing a stipulated settlement. For example, a motion for summary judgment is proper to enforce an ... out-of-court settlement agreement." Cal. Civ. Prac. Procedure § 20:6 (West 2005) (citing *Kilpatrick v. Beebe*, 219 Cal.App.3d 1527, 269 Cal.Rptr. 52, 53–54 (1990)); *see also Gorman v. Holte*, 164 Cal. App.3d 984, 211 Cal.Rptr. 34, 37 (1985) (settlement agreements "are enforceable in a number of ways, including a motion pursuant to Code of Civil Procedure section 664.6, by motion for summary judgment, by separate suit in equity, or by amendment of the pleadings to raise the settlement as an affirmative defense").

satisfaction by the Massmans of any obligation that they had under Settlement Agmt. ¶ 5(b)(iii)(B)—(D) did not constitute a condition to Alameda's obligation to close. The preceding conclusion is compelled because (a) clear, unambiguous language exists neither in the Settlement Agreement nor, for that matter, in the amended Purchase Agreement to the effect that such obligation by the Massmans would constitute such a condition, and (b) such language, as set forth above, is, as a matter of law, required before such a condition can be found to have existed, *see supra* p. 528.

Finally, the Court holds that the Massmans were not at fault for the failure of Alameda to close even presuming *arguendo* that the Massmans contributed to the presence of the *Lis Pendens* on the Title because, as set forth above, the *Lis Pendens* was a permitted title defect that, consequently, did not affect Alameda's obligation to close, *see supra* p. 536.

Therefore, the Court holds that the failure of Alameda to close on May 26, 2004, was not due to any fault on the part of the Massmans, which means that the Purchase Agreement, as modified by, and pursuant to ¶ AM3–1 of, Amendment No. 3, automatically terminated, thereby leaving Alameda without any further rights under the Purchase Agreement.

### F. *Whether the Massmans are precluded from taking advantage of their release and indemnification rights under Settlement Agreement ¶¶ 2 and 10 by virtue of their alleged breach of Settlement Agmt. ¶ 5(b)(iii)(B)—(D)?*

 As just set forth above, Alameda argues that the Massmans defaulted on Settlement Agmt. ¶ 5(b)(iii)(B)—(D) by virtue of the manner in which they settled with the Debtor apparent defaults by the Debtor under the Air Nail Lease, which defaults were the subject of the Massmans' stay relief motion dealt with at the May 18, 2004 hearing. Alameda also argues that such default precludes the Massmans from being able to assert their release and indemnification rights under Settlement Agreement ¶¶ 2 and 10. The Court holds that, even presuming *arguendo* that the Massmans breached Settlement Agmt. ¶ 5(b)(iii)(B)—(D), they may nevertheless seek enforcement, and are entitled to take advantage, of such release and indemnification rights. The Court so holds because (a) the Massmans' release and indemnification rights under Settlement Agreement ¶¶ 2 and 10 are not conditioned upon the performance by the Massmans of any obligation that they had under Settlement Agmt. ¶ 5(b)(iii)(B)—(D), and (b) the Massmans, consequently, may, as a matter of law, seek enforcement and take advantage of such contractual rights even if they breached their independent obligation under Settlement Agmt. ¶ 5(b)(iii)(B)—(D), *see supra* p. 528. The Court holds that such release and indemnification rights of the Massmans are not conditioned upon the performance by the Massmans of any obligation that they had under Settlement Agmt. ¶ 5(b)(iii)(B)—(D) because (a) clear, unambiguous language does not exist in the Settlement Agreement to the effect that performance of such obligation by the Massmans would constitute such a condition, and (b) such language, as set forth above, is, as a matter of law, required before such a condition can be found to have existed, *see supra* p. 528.

### V. *Resolution of Alameda's Counts 1—8 and the Massmans' Counterclaims as Mandated by the Above Interpretation of the Parties' Three Agreements.*

After having construed the parties' three agreements in the foregoing manner,

the Court can now resolve, at the summary judgment stage, Alameda's Counts 1—8 and the Massmans' counterclaims.

 With respect to Alameda's Count 1, wherein Alameda seeks specific performance, Alameda can no longer obtain specific performance regarding the amended Purchase Agreement, that is it can no longer obtain an order compelling the Massmans to sell the Realty, because, as set forth above, the Purchase Agreement, as modified by, and pursuant to ¶ AM3–1 of, Amendment No. 3, automatically terminated, thereby leaving Alameda without any further rights under the Purchase Agreement, *see supra* p. 538. As for specific performance regarding the Settlement Agreement, the Court, as set forth above, concludes that the only provision therein that the Massmans could have conceivably violated was ¶ 5(b)(iii)(B)—(D), *see supra* pp. 535 & 537; however, specific performance regarding such ¶ 5(b)(iii)(B), presuming *arguendo* that such performance has not yet occurred, would now make little sense as a remedy for Alameda given that it can no longer purchase the Realty via the amended Purchase Agreement. Therefore, the Court shall grant summary judgment in the Massmans' favor on Alameda's Count 1.

 As for Alameda's Count 2, wherein Alameda seeks contract breach damages, as just set forth, the only conceivable breach by the Massmans for which Alameda could recover is that of Settlement Agmt. ¶ 5(b)(iii)(B)—(D). However, and unfortunately for Alameda, it cannot possibly now be found to have suffered any damages as a result of such alleged breach given that it can no longer purchase the Realty via the amended Purchase Agreement.[13] Consequently, the Court shall also grant summary judgment in the Massmans' favor on Alameda's Count 2.

Alameda's Count 3, that is Alameda's request for declaratory relief to the effect that the amended Purchase Agreement has not yet terminated and, therefore, remains viable, is frankly moot given that the Court, within the context of ruling on Alameda's breach of contract claim, has already ruled that the amended Purchase Agreement automatically terminated. Nevertheless, and out of an abundance of caution, the Court shall grant summary judgment in the Massmans' favor on Alameda's Count 3.

 With respect to Alameda's Counts 4—6, wherein Alameda seeks to rescind Amendment No. 3 and the Settlement Agreement so that Alameda may then proceed against the Massmans under the Purchase Agreement in its unamended form, the Court rules that Alameda cannot so rescind. The Court rules as it does because (a) contract rescission, as a matter of law, is not permitted for a minor, trivial, technical, or unimportant breach, or for a breach which is collateral, or incidental and subordinate, to the real undertaking or main purpose of the contract, *see supra* p. 529, (b) the only conceivable breach by the Massmans upon which Alameda could base its rescission request—i.e., supposedly that of Settlement Agmt. ¶ 5(b)(iii)(B)—(D)—could not possibly be, from Alameda's present point of view, more minor, trivial, technical, or unimportant given that, as just set forth above, Alameda is now foreclosed from even having been damaged by such alleged breach, *see supra* p. 539, and (c) such supposed breach by

---

13. If the amended Purchase Agreement had not terminated so that Alameda retained the right to thereby purchase the Realty, and presuming *arguendo* that the Massmans violated Settlement Agmt. ¶ 5(b)(iii)(B)—(D), then Alameda likely would have suffered recoverable damages from such a breach.

the Massmans is also of a contractual provision that is clearly collateral, or incidental and subordinate, to the main purposes—i.e., the root—of the Settlement Agreement, that is the purchase/sale of the Realty, settlement of the California Action, and the provision by both parties of full and complete releases. Accordingly, the Court shall also grant summary judgment in the Massmans' favor on Alameda's Counts 4—6.

Alameda's Count 7, that is Alameda's cause of action for the Massmans' alleged breach of the implied covenant of good faith and fair dealing, fails (a) because, as set forth above, such implied covenant, contrary to what Alameda contends, placed upon the Massmans neither an obligation to clear the Title of the *Lis Pendens* nor an obligation to obtain (or pursue) stay relief on Alameda's behalf so as to facilitate Alameda's subsequent expungement of the *Lis Pendens, see supra* pp. 532 & 533, and (b) since, as set forth above, the Massmans did not impair Alameda's ability to close, presuming *arguendo* that the Massmans contributed to the presence of the *Lis Pendens* on the Title, given that, as also set forth above, the *Lis Pendens* was a permitted title defect, *see supra* p. 538. Therefore, the Court shall grant summary judgment in the Massmans' favor on Alameda's Count 7.

With respect to Alameda's Count 8, that is Alameda's fraud cause of action against the Massmans, the Court holds that such cause of action is unambiguously barred by virtue of the Massmans' release rights under Settlement Agreement ¶ 2, which release rights, as set forth above, the Massmans are free to assert even presuming *arguendo* that the Massmans breached Settlement Agmt. ¶ 5(b)(iii)(B)—(D), *see supra* p. 539.

Moving on to the Massmans' counterclaims, the Court rules that the Massmans' Counterclaim 3—i.e., their request for declaratory relief to the effect that (a) the Purchase Agreement has terminated, (b) Alameda consequently no longer has any further rights under the Purchase Agreement, and (c) Alameda consequently no longer has any further rights in or to the Realty—has, much like Alameda's Count 3, essentially been rendered moot. The Court so rules given that (a) the Court, within the context of ruling on Alameda's breach of contract claim, has already ruled that (i) the amended Purchase Agreement automatically terminated, and (ii) Alameda consequently no longer has any further rights under the Purchase Agreement, and (b) Alameda consequently can no longer have any further rights in or to the Realty. Nevertheless, and out of an abundance of caution, the Court shall grant summary judgment in the Massmans' favor on their Counterclaim 3.

With respect to the Massmans' Counterclaim 1, that is their request for turnover of the $100,000 Deposit (together with any interest earned thereon) as liquidated damages, summary judgment in the Massmans' favor is warranted, but not simply by virtue of the fact, as argues the Massmans, that (a) Alameda failed to close by May 26, 2004, and (b) the amended Purchase Agreement thus automatically terminated. The Court disagrees with the Massmans that they are entitled to the $100,000 Deposit as liquidated damages regardless of whether Alameda's failure to so close was excused and the amended Purchase Agreement consequently terminated without any contract breach by Alameda. The source of the Court's disagreement is (a) the language in Amendment No. 3 ¶ AM3–1 to the effect that, after automatic termination of the Purchase Agreement in accordance with such ¶ AM3–1, "Escrow Holder shall pay the $100,000 Deposit (together with any interest earned thereon)

to Seller as liquidated damages *in accordance with Paragraph 21 of the Purchase Agreement*" (emphasis added), and (b) Purchase Agreement ¶ 21, which provision expressly provides that the Massmans shall be entitled to $100,000 in liquidated damages *only if Alameda breaches the Purchase Agreement.* Given the foregoing contractual language, the Court holds that the Massmans are entitled to a turnover of the $100,000 Deposit (together with any interest earned thereon) as liquidated damages only if Alameda breached the amended Purchase Agreement. Fortunately for the Massmans, the Court, as set forth above, has already ruled that Alameda breached the amended Purchase Agreement by virtue of their failure to close by May 26, 2004. *See supra* p. 536. Therefore, the Massmans are entitled to a turnover of the $100,000 Deposit (together with any interest earned thereon) as liquidated damages, thereby compelling the Court to grant the Massmans' summary judgment motion as it pertains to their Counterclaim 1.

The Court also holds that the Massmans are entitled to summary judgment in their favor with respect to their Counterclaim 4, wherein they seek the return by Alameda of all building plans for the Realty that were previously delivered to Alameda. Such decision is compelled because (a) the Purchase Agreement, as set forth above, has automatically terminated pursuant to Amendment No. 3 ¶ AM3–1, and (b) such ¶ AM3–1 unambiguously provides that, upon such termination, Alameda is obligated to return to the Massmans all such building plans.

■ Finally, Settlement Agreement ¶ 10 and Purchase Agreement ¶ 16 unambiguously provide that, as between Alameda and the Massmans, the prevailing party in litigation of the kind that has been pursued in the instant adversary proceed-

ing shall be entitled to indemnification from the other for reasonable attorneys' fees. Purchase Agreement ¶ 16 further provides that "[t]he term 'Prevailing Party' shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be." Given that the Court is granting summary judgment in the Massmans' favor on all eight of Alameda's counts that have been advanced against the Massmans, as well as summary judgment on each of the Massmans' other counterclaims, the Court can only rule that the Massmans are (a) the prevailing party as between themselves and Alameda for purposes of Settlement Agreement ¶ 10 and Purchase Agreement ¶ 16, (b) accordingly entitled to indemnification from Alameda for reasonable attorneys' fees, and (c) thus entitled to summary judgment in their favor on their Counterclaim 2, wherein they seek a recovery from Alameda for their attorneys' fees. Since the Massmans have yet to submit an application to the Court informing the Court of the amount of their attorneys' fees, and so as to effectuate the Court's order that the Massmans may recover such fees to the extent that they are reasonable, the Court directs the Massmans to file with the Court, within fifteen (15) days of the date of the instant opinion and order, an application regarding their attorneys' fees.

### *CONCLUSION*

For all of the foregoing reasons, the Court shall grant the Massmans' summary judgment motion in its entirety.

An appropriate order will be entered.

### *ORDER OF COURT*

**AND NOW**, this **8th day** of **August, 2005**, upon consideration of the summary judgment motion filed by Bruce and Martin Massman, two of the above-named de-

fendants (hereafter "the Massmans"), wherein the Massmans seek the entry of summary judgment in their favor on (a) Counts 1—8 of the amended complaint of Alameda Produce Market, Inc., the above-named plaintiff (hereafter "Alameda"), and (b) all of their counterclaims, that is Counterclaims 1—4;

and subsequent to notice and a hearing on the Massmans' summary judgment motion held on June 22, 2005;

and for the reasons set forth in the accompanying Memorandum Opinion dated **August 8, 2005**;

it is hereby **ORDERED, ADJUDGED, AND DECREED**[1] that **summary judgment is GRANTED in favor of the Massmans** on (a) each of Alameda's Counts 1—8, and (b) each of the Massmans' Counterclaims 1—4.

So as to effectuate the Court's ruling regarding:

(a) the Massmans' Counterclaim 1, Alameda is directed to take any and all necessary actions to cause Commerce Escrow Company, the Escrow Holder, to deliver the $100,000 Deposit (together with any interest earned thereon) to the Massmans within fifteen (15) days of the date upon which the District Court enters final judgment in the instant adversary proceeding;

(b) the Massmans' Counterclaim 4, Alameda is directed, within fifteen (15) days of the date upon which the District Court enters final judgment in the instant adversary proceeding, to deliver to the Massmans all building plans for the Realty that were previously delivered by the Mass-

mans to Alameda (and any copies of such plans); and

(c) the Massmans' Counterclaim 2, the Massmans are directed, within fifteen (15) days of the date of the instant opinion and order, to file with the Court an application regarding their attorneys' fees.

**IN SUMMARY,** the Massmans' summary judgment motion is granted in its entirety.

---

1. Because Alameda's Counts 1—8 and the Massmans' counterclaims all constitute non-core matters, all of the Court's rulings and orders set forth below constitute proposals to the District Court, which shall enter final judgment.